No. 14-35173

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

SAINT ALPHONSUS MEDICAL CENTER–NAMPA INC., SAINT ALPHONSUS
HEALTH SYSTEM INC.; SAINT ALPHONSUS REGIONAL MEDICAL CENTER,
INC.; TREASURE VALLEY HOSPITAL LIMITED PARTNERSHIP; FEDERAL
TRADE COMMISSION; STATE OF IDAHO,

*Plaintiffs-Appellees*,

and

IDAHO STATESMAN PUBLISHING, LLC; THE ASSOCIATED PRESS;
IDAHO PRESS CLUB; IDAHO PRESS-TRIBUNE LLC; LEE PUBLICATIONS INC.,

*Intervenors*,

v.

ST. LUKE'S HEALTH SYSTEM, LTD.; ST. LUKE'S
REGIONAL MEDICAL CENTER, LTD.; SALTZER MEDICAL GROUP,

*Defendants-Appellants.*

Appeal from the United States District Court for the District of Idaho, Case Nos. 1:12-cv-
00560-BLW (Lead Case) and 1:13-cv-00116-BLW, the Honorable B. Lynn Winmill,
Presiding

## BRIEF OF AMICUS CURIAE AMERICA'S ESSENTIAL HOSPITALS IN
## SUPPORT OF REVERSAL OF THE DISTRICT COURT

Barbara D.A. Eyman
Eyman Associates, PC
810 First Street, NE
Suite 201
Washington, DC 20002
(202) 567-6203
General Counsel for Amicus Curiae

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel to America's

Essential Hospitals certifies that America's Essential Hospitals has no parent

companies, subsidiaries, or affiliates that have issued shares to the public.

Date:  June 19, 2014          s/ Barbara D.A. Eyman
                              Barbara D.A. Eyman
                              Eyman Associates, PC
                              General Counsel for America's Essential Hospitals

# TABLE OF CONTENTS

STATEMENT REQUIRED UNDER FEDERAL RULE OF APPELLATE
PROCEDURE 29(C)(5) .............................................................. vi

I.    IDENTITY AND STATEMENT OF INTEREST OF AMICUS CURIAE
      AMERICA'S ESSENTIAL HOSPITALS .......................................1

II.   INTRODUCTION ...........................................................2

III.  ARGUMENT ...............................................................5

      A.    Integration Undertaken by Safety Net Systems Improves Access for
            Vulnerable Populations, Who Need Coordinated Care the Most .........5

            1.    *Integration by Safety Net Hospitals Is Mission-Driven,
                  Allowing For Increased Access to Care in Underserved
                  Communities* ..............................................6

            2.    *Integration Allows Physicians to Be Blind to Payer Source and
                  Thereby Increases Primary Care Access for Vulnerable
                  Populations* ..............................................8

            3.    *Integration Alleviates Outpatient Specialty Care Shortages* ......9

      B.    Integration Is a Critical Strategy for Resource-Constrained Essential
            Safety Net Hospitals To Achieve Accountable, Coordinated Care ....10

            1.    *Integration Allows Resource-Constrained Safety Net Hospitals
                  to Invest in the Infrastructure Needed to Support Accountable
                  Care* ....................................................11

            2.    *Tight Integration Facilitates Greater Financial Alignment and
                  Data Sharing, Both of Which Are Critical To Achieve the Triple
                  Aim* .....................................................13

IV.   CONCLUSION ............................................................15

# TABLE OF AUTHORITIES

## STATUTES

42 U.S.C. § 1320a-7b ............................................................................ 14

42 U.S.C. § 1395nn ............................................................................... 14

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119
(2010) ................................................................................................... 2

## OTHER AUTHORITIES

Alain C. Enthoven & Laura A. Tollen, *Competition in Health Care: It Takes
Systems To Pursue Quality and Efficiency*, Health Affairs (web exclusive Sept. 7,
2005) ............................................................................................... 2, 14

America's Essential Hospitals, *Annual Hospital Characteristics Survey, FY 2012*
(results to be published) ............................................................ 7, 8, 11, 12

Commonwealth Fund & Nat'l Acad. for State Health Policy, *Including Safety-Net
Providers in Integrated Delivery Systems: Issues and Options for Policymakers*
(Aug. 2012) ............................................................................... 6, 13

Commonwealth Fund, *Denver Health: A High-Performance Public Health Care
System* (July 2007) ............................................................................ 4

Commonwealth Fund, *Ensuring Equity: A Post-Reform Framework to Achieve
High Performance Health Care for Vulnerable Populations* (Oct. 2011) ......... 8, 9

Ctr. for Studying Health System Change, *Suburban Poverty and the Health Care
Safety Net* (July 2009) ....................................................................... 10

Deborah Bachrach et al., *Toward a High Performance Health Care System for
Vulnerable Populations: Funding for Safety-Net Hospitals* (Mar. 2012) ........... 13

Families USA, *Reforming the Way Health Care Is Delivered Can Reduce Health
Care Disparities* (May 2014) ................................................................. 8

Governor's Office of Health Innovation and Transformation, *Illinois Alliance for
Health Innovation Plan* (2013),
www2.illinois.gov/gov/healthcarereform/Pages/GOHIT.aspx ............................ 2

Kaiser Comm'n on Medicaid & the Uninsured, *Integrating Physical and Behavioral Health Care: Promising Medicaid Models* (2014) ............................14

Katherine Neuhausen et al., *Disproportionate-Share Hospital Payment Reductions May Threaten the Financial Stability of Safety-Net Hospitals*, Health Affairs (June 2014) ..........................................................................................................11

Katherine Neuhausen et al., *Integrating Community Health Centers Into Organized Delivery Systems Can Improve Access to Subspecialty Care*, Health Affairs (Aug. 2012) ................................................................................................. 10, 14

Nadereh Pourat et al., *In Ten California Counties, Notable Progress in System Integration Within the Safety Net, Although Challenges Remain*, Health Affairs (Aug. 2012) ............................................................................................. 6, 12, 15

Nakela L. Cook et al., *Access to Specialty Care and Medical Services in Community Health Centers*, Health Affairs (Sept./Oct. 2007) ............................10

Nat'l Acad. for State Health Policy, *Medical Home & Patient-Centered Care Interactive Map*, www.nashp.org/med-home-map ..................................................3

Nat'l Acad. for State Health Policy, *State "Accountable Care" Activity Map*, www.nashp.org/state-accountable-care-activity-map..............................................3

Robert A. Gerberry et al., *The Best and Worst Practices in Hospital-Physician Alignment* (June 25, 2012) ...................................................................................14

**RULES**

42 C.F.R. § 1001.952 ...............................................................................................14

42 C.F.R. § 411.357 ................................................................................................14

**STATEMENT REQUIRED UNDER FEDERAL RULE OF APPELLATE PROCEDURE 29(C)(5)**

No party's counsel authored this brief in whole or in part.  No party, party's counsel, or person – other than the amicus curiae – contributed money intended to fund the preparation or submission of this brief.


Date:  June 19, 2014        <u>s/ Barbara D.A. Eyman</u>
                                Barbara D.A. Eyman
                                Eyman Associates, PC
                                General Counsel for America's Essential Hospitals

# I.    IDENTITY AND STATEMENT OF INTEREST OF AMICUS CURIAE AMERICA'S ESSENTIAL HOSPITALS

Amicus Curiae America's Essential Hospitals is the leading association and champion for hospitals and health systems dedicated to high-quality care for all. America's Essential Hospitals represents more than 220 essential hospitals and health systems across the country.  Filling a safety net role in their communities, members of America's Essential Hospitals are essential community providers that predominantly serve the uninsured and patients covered by public programs.

Specifically, essential hospitals provide a disproportionate share of the nation's uncompensated care and devote more than half of their care to low-income uninsured or Medicaid patients, many of whom struggle with complex health and social needs.  Even with their limited financial resources, essential hospitals demonstrate an ongoing commitment to serving their communities' most vulnerable patients, including by offering specialized services that would otherwise be lacking in their communities (*e.g.*, trauma centers, emergency psychiatric facilities, burn care), expanding access with extensive networks of on-campus and community-based clinics, furnishing culturally and linguistically appropriate care, training health care professionals, and offering public health programs.  Through its relationship with members across the country, America's Essential Hospitals has gained expertise regarding the unique challenges and benefits associated with integration involving the safety net, and offers the court a national perspective on

this case not provided by the parties. America's Essential Hospitals received the consent of all parties to file this brief, including the private plaintiffs as a courtesy.

## II.    INTRODUCTION

The passage of the Affordable Care Act (ACA) accelerated a nationwide shift towards accountable, coordinated care to further the "Triple Aim" of health care delivery: higher quality care, at lower costs, while improving population health. *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (promoting "Improving the Quality and Efficiency of Health Care" in Title III and "Prevention of Chronic Disease and Improving Public Health" in Title IV). Health care experts and empirical studies have widely recognized that tight clinical and financial integration facilitates accountable, coordinated care. *See, e.g.*, Alain C. Enthoven & Laura A. Tollen, *Competition in Health Care: It Takes Systems To Pursue Quality and Efficiency*, Health Affairs (web exclusive Sept. 7, 2005); Governor's Office of Health Innovation and Transformation, *Illinois Alliance for Health Innovation Plan* (2013)[1] (identifying the "[c]reat[ion of] comprehensive, integrated delivery systems" as the first of five major objectives endorsed by a broad array of stakeholders to promote patient-centered care and to improve the health of communities). Particularly for low-income and vulnerable populations, state Medicaid programs are increasingly

_____

[1] *Available at* www2.illinois.gov/gov/healthcarereform/Pages/GOHIT.aspx.

promoting integration as a strategy to improve access to high-quality, cost-effective care, including through the adoption of medical homes, accountable care organizations, and bundled payment models. *See e.g.*, Nat'l Acad. for State Health Policy, *Medical Home & Patient-Centered Care Interactive Map*[2] & *State "Accountable Care" Activity Map*.[3]

Members of America's Essential Hospitals have adopted a variety of approaches to integration. On one end of the spectrum, some essential hospitals have pursued loose affiliations with community physicians, which involve some shared performance standards and health improvement strategies, some data sharing, and more limited financial alignment. Virginia Commonwealth University Health System, for example, has established the Virginia Coordinated Care for the Uninsured Program (VCC), through which it contracts with 52 primary care providers to increase the availability of coordinated care for the greater Richmond area's indigent patients. The VCC program has resulted in improved health outcomes and reductions in emergency department visits, though indigent patients still face challenges in getting timely access to specialty care.

Other essential hospitals have integrated tightly with physicians, employing physicians (either directly or through exclusive contracting arrangements) to

_____

[2] *Available at* www.nashp.org/med-home-map.

[3] *Available at* www.nashp.org/state-accountable-care-activity-map.

facilitate greater levels of financial alignment, data sharing, and care coordination and to support the shift to value- and risk-based payment. In affiliating with Saltzer Medical Group, St. Luke's Health System sought to achieve this sort of tight integration with physicians.[4] At the far end of the spectrum, essential hospitals integrate tightly not only with physicians, but also with other community providers, social organizations, or health plans. Denver Health, a comprehensive, integrated system that includes a major safety net hospital, employed physicians, community health centers, school-based clinics, public health clinics, and a health plan, has received national recognition for its success in providing high-quality, efficient care to vulnerable populations. *See, e.g.*, Commonwealth Fund, *Denver Health: A High-Performance Public Health Care System* (July 2007).

A variety of factors drive hospitals' decisions about what level and form of integration to pursue, including the characteristics of the patient population and the availability of health and social services in a particular community, market dynamics and geography, the governance structure and resources of a hospital, the extent to which there is an existing infrastructure to support coordination and collaboration among providers (*e.g.*, information sharing, data analytics capabilities, evidence-based protocols), and the extent to which a hospital's

---

[4] Throughout the remainder of this brief, the term "integration" is used to refer to tight integration of the sort pursued by St. Luke's and Saltzer, as opposed to looser forms of affiliation.

mission aligns with that of community providers and organizations. Safety net

providers must consider additional complexities – the specialized health and social

needs of the vulnerable patients they serve, their thin margins, and for many safety

net hospitals, the requirements associated with being a public entity (*e.g.*, the

public appointment of board members, public contracting and procurement

requirements, civil service requirements applicable to public employees). What is

best in one community may not be effective in another.

For safety net hospitals in particular, who provide access for our nation's

most vulnerable patients and face unique resource constraints, tight integration

with physicians must remain a viable option. The lower court's decision, if

upheld, will have a chilling effect on tight integration, threatening the ability of

safety net hospitals to expand access to high-quality care for vulnerable

populations and to ensure that those most in need of coordinated care receive it.

Accordingly, the impact of the lower court's decision, if upheld, will transcend the

particular transaction in dispute and have national implications for the delivery of

care to vulnerable populations and health care equity.

**III.  ARGUMENT**

**A.  Integration Undertaken by Safety Net Systems Improves Access for
Vulnerable Populations, Who Need Coordinated Care the Most**

In ordering the divestiture of the affiliation between St. Luke's Health

System and the Saltzer Medical Group, the lower court did not consider that

integration may be necessary in some communities to improve access for vulnerable populations. Research reflects that integration by safety net hospitals "holds promise for expanding access to care as well as improving health care quality and outcomes while controlling costs." Commonwealth Fund & Nat'l Acad. for State Health Policy, *Including Safety-Net Providers in Integrated Delivery Systems: Issues and Options for Policymakers* 4 (Aug. 2012) ("*Commonwealth*"); *see also* Nadereh Pourat et al., *In Ten California Counties, Notable Progress in System Integration Within the Safety Net, Although Challenges Remain*, Health Affairs (Aug. 2012). Courts' failure to take into account access for vulnerable populations as an important pro-competitive consideration in antitrust cases could thus have national implications for the access to care of vulnerable populations.

1.     *Integration by Safety Net Hospitals Is Mission-Driven, Allowing For Increased Access to Care in Underserved Communities*

For safety net hospitals, decisions about the need to integrate and the form of integration are driven by their mission to provide high-quality, cost-effective care to all patients, regardless of their ability to pay. The structure of safety net hospitals is driven by the vulnerable populations that they serve – the uninsured, Medicaid, and Medicare patients.[5] Safety net hospitals pursue integration in

---

[5] In 2012, members of America's Essential Hospitals furnished 73 percent of their inpatient and outpatient services to Medicaid patients (28 percent), Medicare

underserved rural and low-income urban areas to improve access to care; they are not focused on expanding into wealthier suburban areas to gain market leverage with payers.  Indeed, with commercial insurance representing a relatively small portion of their payer mix, it makes little financial sense for safety net hospitals to expend the significant time and resources needed to achieve integration as a means to increase leverage with commercial plans.  And safety net hospitals cannot hope to gain leverage with their primary sources of financing, because they have no ability to negotiate prices with governmental payers.  *See* Trial Tr. 2285.

Moreover, integration by the safety net promises to improve access to coordinated care for the patients who need it most.  Essential safety net hospitals predominantly serve patients facing complex medical, behavioral, and social issues, such as food and housing insecurity.  They treat patients who are sicker, more likely to engage in unhealthy behaviors (*e.g.*, smoking, physical inactivity, poor diet, substance abuse), and more likely to have multiple comorbidities.[6] Likewise, more than half of patients receiving care at essential safety net hospitals

---

patients (27 percent), and the uninsured (18 percent).  Likewise, Medicare and Medicaid are the most important sources of financing for member hospitals, representing 57 percent of total net revenue in 2012.  America's Essential Hospitals, *Annual Hospital Characteristics Survey, FY 2012* ("*Characteristics Survey*") (results to be published).

[6] *See, e.g.*, Silvia Stringhini, et al., *Association of Socioeconomic Position with Health Behaviors and Mortality*, Journal of the American Medical Association, 1159-66 (Mar. 2010).

are racial or ethnic minorities, many of whom face language and cultural barriers to care.[7] These vulnerable populations stand to gain the most from integration, which enables coordinated "whole-person" care, investment in substance abuse, social work, translation, and other poorly reimbursed activities that address the diverse care needs of vulnerable populations, and population-based strategies for improving health. Commonwealth Fund, *Ensuring Equity: A Post-Reform Framework to Achieve High Performance Health Care for Vulnerable Populations* 11 (Oct. 2011) ("*Ensuring Equity*") ("Vulnerable patients may disproportionately benefit from greater clinical integration among providers."). Thus, integration by safety net hospitals may help to reduce the significant disparities associated with our current fragmented system. *See, e.g.*, Families USA, *Reforming the Way Health Care Is Delivered Can Reduce Health Care Disparities* (May 2014).

> 2.    *Integration Allows Physicians to Be Blind to Payer Source and Thereby Increases Primary Care Access for Vulnerable Populations*

Integration encourages increased access to primary care for vulnerable populations because it alters physicians' financial incentives. Acting independently, physicians are reliant on fee-for-service reimbursement, and thus have an incentive to favor patients with higher-paying commercial or Medicare coverage. Many primary care physicians that are not part of a larger system simply do not accept new uninsured patients or Medicaid beneficiaries, given Medicaid's

---

[7] *Characteristics Survey.*

low reimbursement rates. Physicians who are salaried are blind to payer source, thus integration incentivizes physicians to accept patients of all types equally and greatly expands their capacity to serve the uninsured and Medicaid beneficiaries.

Indeed, the integration of Saltzer physicians into St. Luke's Health System achieved this important benefit. Prior to integration, at least 40 percent of Saltzer Medical Group physicians did not accept new Medicare or Medicaid patients. Trial Tr. 787-88. Following integration, Saltzer physicians now receive the same payment regardless of patients' insurance status, increasing access in Nampa for Medicaid and uninsured patients. Findings of Fact & Conclusions of Law 11;[8] Trial Tr. 2278-83, 3322-23. Evidence shows that "[a]mong low-income patients, access to primary care is associated with better preventive care, better management of chronic conditions, and reduced mortality." *Ensuring Equity* 34. If the lower court's decision is upheld, these important benefits of improved primary care access will be undermined not only in Nampa, but across the country.

### 3. *Integration Alleviates Outpatient Specialty Care Shortages*

Tight integration between community providers and safety net hospitals also has been demonstrated to increase access to specialty care. Katherine Neuhausen et al., *Integrating Community Health Centers Into Organized Delivery Systems*

---

[8] Though the lower court recognized in its findings of fact that the affiliation would improve access for vulnerable populations, access considerations were not taken into account in assessing the pro-competitive benefits of the transaction or in the court's conclusions of law.

*Can Improve Access to Subspecialty Care*, Health Affairs (Aug. 2012) ("*Integrating CHCs*"). Expanding access is imperative, because vulnerable populations have had limited access to outpatient specialty services historically. In many localities, members of America's Essential Hospitals are the only source of specialty care. It is widely documented that limited access to outpatient specialty care results in long waits, greater use of emergency department and inpatient services, and ultimately, poorer health outcomes. *See, e.g.*, Ctr. for Studying Health System Change, *Suburban Poverty and the Health Care Safety Net* (July 2009); Nakela L. Cook et al., *Access to Specialty Care and Medical Services in Community Health Centers*, Health Affairs (Sept./Oct. 2007). The lower court's decision, left unchecked, could foreclose an important avenue needed to improve access to specialty outpatient care to the detriment of vulnerable populations.

**B.    Integration Is a Critical Strategy for Resource-Constrained Essential Safety Net Hospitals To Achieve Accountable, Coordinated Care**

In addition to improving access for vulnerable populations, integration involving the safety net accomplishes many other pro-competitive benefits. The lower court itself recognized these benefits, including improving quality and patient outcomes, aligning the incentives of hospitals and physicians, promoting team-based medicine, facilitating care coordination and real-time sharing of robust electronic health record (EHR) systems, and enabling a shift to value- and risk-based payment models. *See* Findings of Fact & Conclusions of Law 3, 28-38. But

the court mistakenly concluded that the same benefits can be achieved absent integration. In some communities, integration may be the most effective and feasible strategy for resource-constrained safety net hospitals to improve care and access for vulnerable populations.

1.  *Integration Allows Resource-Constrained Safety Net Hospitals to Invest in the Infrastructure Needed to Support Accountable Care*

Members of America's Essential Hospitals provide a significant amount of uncompensated care. Fifteen percent of our members' costs in 2012 were uncompensated, compared with 6 percent of costs for hospitals nationally.[9] Recent evidence suggests that this uncompensated care burden will continue to grow, even in states that are participating fully in ACA's coverage expansions. Katherine Neuhausen et al., *Disproportionate-Share Hospital Payment Reductions May Threaten the Financial Stability of Safety-Net Hospitals*, Health Affairs (June 2014). In addition, members of America's Essential Hospitals often serve as the only source of care for many essential services, including trauma, mental health, substance abuse, translation, transportation, patient navigation, and social work services, which are reimbursed poorly, if at all. Not surprisingly, then, member hospitals operate on margins substantially lower than the rest of the hospital industry—with an average operating margin of negative 0.4 percent, compared to

---

[9] *Characteristics Survey*.

6.5 percent for hospitals nationally.[10]

Shifting from a fragmented health care delivery system to an accountable, coordinated one is no simple or inexpensive task for a hospital system to undertake, particularly when the hospital serves a safety net population. It requires significant restructuring and investments in, among other things, establishing primary and specialty outpatient care capacity in underserved communities, adopting robust EHR systems that are accessible across care settings, hiring non-clinical staff such as care managers, developing and disseminating evidence-based practices and protocols, and integrating traditionally separate services such as physical and mental health services. Though safety net hospitals are making great strides in these areas, they face unique financial barriers to undertaking all of these investments given their uncompensated care burden, payer mix, and specialty service offerings. *See* Pourat 1719 ("It is more challenging to organize integrated delivery systems in the safety net than in commercial settings.").

The integration of acute and primary care providers with aligned objectives helps to alleviate the resource constraints of safety net hospitals in a number of ways. First, it allows for the capture of savings and the distribution of funding at a system level, rather than the individual provider level. This allows the system to structure compensation to encourage providers to collaborate as a team, and to

---

[10] *Characteristics Survey.*

manage costs and improve quality across all care settings.  As a recent report of the

Commonwealth Fund noted, "[t]he financing shift possible within an integrated

delivery system . . . allow[s] for greater investment in preventive and primary care

as well as care coordination—areas of care in which safety-net providers tend to

excel." *Commonwealth* 6.  Integration also helps to align the interests of providers

with those of patients, ensuring that providers' focus is on improving the overall

health of patients and communities.  Finally, integration gives safety net hospitals

greater flexibility to deploy their scant resources and to reinvest cost savings to

fund important non-clinical services that are not covered under traditional fee-for-

service reimbursement methodologies, such as care coordinators and prevention,

outreach, and educational activities.  *Id.* at 9.  Accordingly, experts have

specifically recommended that national policies "support[] clinical integration

across hospitals and community-based settings" to sustain safety-net systems and

preserve access as our fragmented delivery system is reformed.  Deborah Bachrach

et al., *Toward a High Performance Health Care System for Vulnerable*

*Populations: Funding for Safety-Net Hospitals* x, 25 (Mar. 2012).

> **2.**     *Tight Integration Facilitates Greater Financial Alignment and Data Sharing, Both of Which Are Critical To Achieve the Triple Aim*

The lower court's finding that looser affiliations may achieve the same pro-

competitive benefits is contrary to the health care literature and our members' own

experiences, which indicate that loose affiliation does not necessarily achieve the

same effects as tight integration. *See, e.g.*, Enthoven W5-431; Kaiser Comm'n on Medicaid & the Uninsured, *Integrating Physical and Behavioral Health Care: Promising Medicaid Models* 9 (2014) (concluding that "fully integrated services and fiscal accountability," as opposed to looser models of integration, "underpin truly person-centered and holistic care"); *Integrating CHCs*. As one example, hospitals have greater flexibility under fraud and abuse laws to offer financial incentives to employed physicians as compared to loosely affiliated physicians, allowing for greater alignment with employed physicians.[11]

Likewise, providers have a greater ability to share and analyze data, and to use such data to coordinate and improve care, when all parties have full access to the same EHR system. Independent providers seeking to access a hospital's EHR system, or seeking to make their own system interoperable with a hospital's separate system, face significant technical and financial barriers. And where resource-constrained safety net providers are involved, the barriers are often insurmountable. St. Luke's own circumstances demonstrate this point. *See, e.g.*, Trial Tr. 2820-24. Even if independent providers can obtain access to a hospital's

---

[11] *Compare* 42 U.S.C. §§ 1320a-7b(b)(3)(B), 1395nn(e)(2), *and* 42 C.F.R. §§ 411.357(c), 1001.952(i) (Stark exception and anti-kickback statute safe harbor for employment), *with* 42 U.S.C. § 1395nn(e)(3), *and* 42 C.F.R. §§ 411.357(d), 1001.952(d) (Stark exception and anti-kickback statute safe harbor for contractors); *see also* Robert A. Gerberry et al., *The Best and Worst Practices in Hospital-Physician Alignment* (June 25, 2012) ("[A]lignment with independent physicians presents a greater degree of legal risk than simply employing doctors.").

EHR system, they typically do not obtain access to the same data set or functionalities as employed physicians. Pourat 1723 (finding that "private contracted providers rarely had access to features beyond electronic referral management, electronic prescribing, and basic patient data," and that data entry capabilities were rarely offered). Tight integration, on the other hand, allows hospitals and physicians to share full access to the same EHR system, thereby unlocking the full potential of EHR to coordinate care, improve quality and population health, adopt risk-based payment, and reduce costs.

## IV. CONCLUSION

In ordering the divestiture of the affiliation between St. Luke's Health System and the Saltzer Medical Group, the lower court improperly failed to consider a critical pro-competitive benefit of integration when undertaken by essential safety net hospitals—improved access for vulnerable populations. Equity, not just cost and quality, must be considered. The lower court's decision, if upheld, will have a chilling effect, deterring essential safety net hospitals from pursuing tight integration as a strategy to improve access to high-quality, coordinated care for vulnerable patients. Courts should take access for vulnerable populations into account when deciding antitrust cases, or access to care for millions of vulnerable Americans will be threatened and inequities in care for vulnerable populations will be exacerbated.

Respectfully submitted,

s/ Barbara D.A. Eyman
Eyman Associates, PC
810 First Street, NE
Washington, DC 20002
(202) 567-6203
General Counsel for Amicus Curiae

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

This brief complies with the type-volume limitation of Fed. R. App. P. 29 because it contains 3,603 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).


Date: June 19, 2014       s/ Barbara D.A. Eyman
Barbara D.A. Eyman
Eyman Associates, PC
General Counsel for America's Essential Hospitals

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing brief was filed electronically with the Court via the CM/ECF system and further certify that a copy was served on all parties or their counsel of record through the CM/ECF system.

Date: June 19, 2014        s/ Barbara D.A. Eyman
                                        Barbara D.A. Eyman
                                        Eyman Associates, PC
                                        General Counsel for America's Essential Hospitals